## ROOT *v.* THIRD AVE. R. CO.

*(Circuit Court, S. D. New York.* February 4, 1889.)

PATENTS FOR INVENTIONS—PRIOR USE.

> The improvement in the construction of cable railroads, for which letters patent No. 262,162, August 1, 1882, were granted, was devised by the patentee in the expectation of being employed to build a certain road, and was utilized by the owner of such road at great cost, and was of a permanent nature. The patentee was superintendent of the road, but reserved no control of the invention, and suggested no change in it, and made no examination of the road for the purpose of ascertaining its efficiency. *Held,* that the use of the invention in such road after its completion and in its regular operation was public, and not experimental, though the patentee testified that he had doubts of its durability, he never having expressed them to the owner of the road; and such use having been for more than two years before the application for the patent, the patent is invalid.

In Equity. Bill for the infringement of a patent.
*George Harding* and *George J. Harding,* for complainant
*Frost & Coe,* for defendant.

WALLACE, J. The complainant sues for infringement of letters patent granted to him August 1, 1882, (No. 262,162,) for an "improve-

---

[1] Dolbear v. Telephone Co., 8 Sup. Ct. Rep. 778, 785.   [2] Id. 778.

ment in the construction of cable railroads." His application for the patent was filed September 3, 1881. The California Street Railroad, a cable railway in the city of San Francisco, was built by the patentee, completed, and went into regular operation prior to April 11, 1878, and as constructed embodied the invention described in the patent in suit. The defendant insists that this is a public use of the patented invention more than two years prior to the patentee's application for his patent, and consequently invalidates the patent. The complainant contends that this was an experimental use of the invention, and that the application was filed within two years after the patentee became satisfied that his invention was a practical success. It is conceded that the road as built embodied the invention of the patent; that Mr. Root had complete charge of the construction of the road, and built it for the projectors; and that it has been operated ever since April, 1878, as built, without any changes or modifications in plan or details. The evidence is that in the early part of 1876 the projectors obtained a franchise to lay and operate a cable railway in California street, one of the public thoroughfares of the city of San Francisco. In the expectation of being employed as the consulting engineer to build the road, the complainant investigated the subject of cable roads, and matured the invention in controversy between May and September, 1876. In September, 1876, he disclosed the invention to the projectors; between that time and January, 1877, made a model of it; and in February, 1877, laid down an experimental section of the cable railway embodying the invention in the yard of the Central Pacific Railway Company in San Francisco. His invention was adopted by the projectors, and work was commenced upon the structure in July, 1877. The road cost, with the equipment, $418,000. It was about two miles in length, and the road-bed and tunnel construction cost about $225,000. From April 9, 1878, the structure has been in regular, successful use as a street railway, carrying passengers for pay. Up to the time when the complainant made application for the patent in suit, and until 1883, the complainant was superintendent of the road for the owners. In explanation of his delay in making the application for the patent the complainant testifies that he did not wish to patent the invention if the structure proved weak or undesirable, and he did not feel sufficiently certain of its durability and general practicability until the year 1881; that there was no way but by trial in a public street, through a long period of time, to determine to what extent the moving of cars and the street traffic over a rail connected to iron work without the intervention of any wood would affect the durability of the structure, or to what extent changes of temperature and the effect of water and rust would tend to separate the iron work from the concrete in which it was imbedded; and that, while he believed there was more than an even chance of its proving a durable and desirable structure, he had some doubts in his own mind, and was influenced also by the doubts expressed by others in whose judgment he had confidence. He admits that he never expressed these doubts to the projectors, either while discussing with them the features

of his invention, or while the road was being built, or while he remained its superintendent, and after it was completed. In answer to a question whether he had any doubts of the durability of the structure after the road was completed, he states that in the spring of 1879, while making an extension of the railway, some parts of the structure were exposed, and he then saw some indications of the loosening of the yokes in the concrete, and "had some little fear at that time" that trouble might arise in that respect. Manifestly the complainant received a consideration for devising and consenting to the use of an invention which was designed to be a complete, permanent structure, which was to cost a large sum of money, and which he knew would not meet the expectation of those who had employed him, unless it should prove to be in all respects a practically operative and reasonably durable one. If he had entertained any serious doubts of its adequacy for the purpose for which it was intended, it would seem that he would not have recommended it in view of the considerable sum it was to cost. At all events, he did not treat it as an experimental thing, but allowed it to be appropriated as a complete and perfect invention, fit to be used practically, and just as it was, until it should wear out, or until it should demonstrate its own unsuitableness. He turned it over to the owners without reserving any future control over it, and knowing that, except as a subordinate, he would not be permitted to make any changes in it by way of experiment; and at the time he had no present expectation of making any material changes in it. He never made or suggested a change in it after it went into use, and never made an examination with a view of seeing whether it was defective, or could be improved in any particular.

In *Manufacturing Co.* v. *Sprague*, 123 U. S. 249, 8 Sup. Ct. Rep. 122, it was held that when it is clearly established that there was a public use of the invention by the inventor for more than two years prior to his application for a patent for it, the burden is on him to show by convincing proof that the use was not a public use, in the sense of the statute, but that it was for the purpose of perfecting an incomplete invention by tests and experiments. And in defining the distinction between a public and an experimental use the court in that case used the following language:

"A use by the inventor for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as an incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principal and not the incident must give character to the use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for the purposes of experiment. Where the substantial use is not for that purpose, but is otherwise public, and for more than two years prior to the application, it comes within the prohibition."

Tested by the rule thus stated the proofs do not show a use substantially for experiment, but show such a public use of the invention as must defeat the patent. The facts are in marked contrast with those in the

case of *Elizabeth* v. *Pavement Co.*, 97 U. S. 126. There the use was solely for experiment. In the language of the opinion in that case:

"Nicholson wished to experiment on his pavement. He believed it to be a good thing, but he was not sure; and the only mode in which he could test it was to place a specimen of it in a public roadway. He did this at his own expense, and with the consent of the owners of the road. * * * He wanted to know whether his pavement would stand, and whether it would resist decay. Its character for durability could not be ascertained without its being subjected to use for a considerable time. He subjected it to such use, in good faith, for the simple purpose of ascertaining whether it was what he claimed it to be."

A decree is ordered dismissing the bill with costs.