Mr. Chief Justice Alvey
delivered the opinion of the Court :
This is an appeal from the Patent Office, taken from the refusal of the Assistant Commissioner of Patents to grant to. *482 the appellant, Julius C. Tournier, a patent for a design for an attaching-plug for electric circuits, as set forth in his application. The application was filed in the Patent Office November 30, 1898.
The specification and claim of the alleged invention, as set forth in the application, are as follows:
“ As shown in the drawings, referred to,, the leading or material feature of my design consists of the shape or configuration of the attaching-plug. The top A of the plug is expanded into a cap having a wide, smooth, cylindrical band a extending around the plug. The top of the cap is shaped approximately to a spherical segment arising directly from the band. The lower part B of the plug has spiral grooves b and a tapering end b', with a slightly projecting tip b2.
“ The top C of the plug, seen best in Fig. 1, has an approximately central aperture c, and an opening c' near one side of its circular periphery. It is apparent that my design may be applied to fuse-plugs or similar articles for use in electric circuits.
“ What I claim as new and desire to secure by letters patent of the United States is—
“ The design for an attaching-plug for electric circuits, as herein set forth.”
It appears that the application in this case was filed in the Patent Office eight days after the grant of a patent to A. P. Seymour, No. 29,708, upon a similar claim for invention, and the application of the appellant was put in interference with that patent, upon affidavits filed under rule 75. The interference proceeding was brought to a determination, and priority of invention was found in favor of the appellant. But in the direct proceeding on the claim for a patent, in view of the evidence that had been produced and filed in the case on the interference proceeding, the officials in the Patent Office refused the patent to the appellant, *483 upon the ground that the attaching-plug, which the appellant claims as his invention and design, was in public use as a complete article in the shops of the General Electric Company for more than two years prior to the filing date of the appellant’s application, viz., November 30, 1898. This was the concurrent judgment of all three of the tribunals that considered the matter in the Patent Office; and the inquiry here being matter of fact, we must find in the record, according to established principle, some clear and definite evidence to warrant this court in arriving at a different conclusion. The question of public use for more than two years prior to the application of the appellant is really the only question that need be decided, according to the view we have of this case, though if we were to hold that there had been no such public use as would constitute a bar to the appellant’s right to the patent, other questions would then be presented, such as have been argued at bar.
This being an application for a patent for a design, it is made under section 4929 of the Revised Statutes of the United States, which provides that — “any person who, by his own industry, genius, efforts, and expense, has invented and produced any new and original design for manufacture, etc.; ... or any new, useful and original shape or configuration of any article of manufacture, the same not having been known or used by others before his invention or production thereof, or patented or described in any printed publication, may, upon payment of the fee prescribed, and other due proceedings had the same as in cases of inventions or discoveries, obtain a patent therefor.” And by section 4933, Revised Statutes, it is provided that, “ all the regulations and provisions which apply to obtaining or protecting patents for inventions or discoveries, not inconsistent with the provisions of this title, shall apply to patents for designs.”
The appellant contends that inasmuch as the term useful *484 is employed in the latter clause of section 4929 of Revised Statutes, therefore usefulness is a constituent element' in this class of inventions or designs, with functional utility, and consequently, in order to determine the question of utility or usefulness of the device or design, it is necessary that experimental use be made thereof before applying for a patent. He contends that all the use of the article of invention that has been made prior to the commencement of the period of two years immediately preceding the time of filing the application, was necessary and allowable under the law, for making tests and experiments as to the utility and usefulness of the invention, and that no use for any other purpose or object had been made of the invention before the commencement of the two years prior to the application.
The only foundation for this contention is the word useful, introduced into the statute since the act of 1842, the act authorizing the grant of patents for designs. It was under the original act of 1842 that the patent was issued that was involved in the case of Gorham Manfg. Co. v. White, 14 Wall. 511. According to the decision in that case it is quite clear the appellant could have no ground for the contention that he now makes, upon the construction of the original act of 1842. But since the introduction of the word useful into the statute, the Supreme Court of the United States has held, in more than one case, that, in certain classes of designs embraced by the statute, in addition to the mere sesthetical or artistic effect of the design upon the senses of the spectator, the element of functional utility may be considered in determining the question of the patentability of the design claimed. Lehnbeuter v. Holthaus, 105 U. S. 94; Smith v. Whitman Saddle Co., 148 U. S. 674.
We do not, however, understand the court as intending to go farther than this, and to hold that functional utility is to be regarded as a controlling or even an essential element in a patent for a design. For if so, the design patents would virtually be placed upon the same footing and with *485 the same requirements of patents for mechanical inventions.
But whatever elements may be held to enter into a claim for a patent for a design, the question may be made, as it has been here, whether time for mere experimental use by the inventor, or those acting under his direction, of more than two years prior to his application, should be allowed, without affecting the validity of his claim, as in cases of mechanical inventions, for purposes of perfecting the invention ; and that question is one of very great doubt. We are not aware of any well-considered case that holds the affirmative of the proposition, though there are cases that hold the contrary, and the practice of the Patent Office seems to be in accordance with this latter view. But, as we have said, we do not deem it necessary to decide this question in disposing of this case.
The question here is broadly presented, whether there has been such public use of the invention as will preclude the applicant the right to receive a patent therefor? It is well settled that the statutory bar of public use applies as well to applications for patents for designs as to applications for patents for mechanical'inventions. In other words, all regulations and provisions that are applicable to the obtaining or protecting of patents of the later kind, are, by section 4933, Revised Statutes, made applicable to design patents.
The proof that reflects upon the question of public use was introduced by the appellant in the interference proceeding. In the preliminary statement of the appellant, made under oath, he stated that “molds for the porcelain portions of the device were made by the tool-maker, and subsequently a merchantable specimen was completed, about the 2d day of May, 1896. After the production of the first specimens, I was in consultation with the engineers of the supply department of the General Electric Company, the assignee of my application, and it was finally decided that the article needed no change whatever to adapt it to its purposes, and it was placed in regular production. For some time *486 thereafter it was made in moderate quantities and stored away until such time as the stock of previous constructions should be exhausted. I have had no connection with the commercial introduction of the device, and do not know at what time it was finally placed upon the market; but I do know that it has been produced in very large quantities, and has met with ready sale, and has provéd itself abundantly adapted to the purposes for which it was designed. Many thousands of the plugs have been put into use, and although it has been altered in unessential details, all of its features as originally exemplified in the model have been retained, and it is still in the same shape or configuration as the first model which I produced in the month of September, 1894.” The italics are ours.
In support of this statement of .fact, made by the appellant himself under oath, he produced witnesses, Gale and Wirt, both holding prominent positions in the operative affairs of the General Electric Company, in which the appellant was also employed, and they were examined very fully, as to the time and manner of the use of the device in the shops of the company. Gale, on cross-examination, stated:
“X-Q. 31. Have you stated when you delivered the models?
“A. Yes, sir; the cover was delivered on Feb. 7, 1896; the base on Feb. 21st, 1896.
“X-Q. 32. How soon after that did you see any of these completed attaching-plugs ?
“A. Two or three weeks; perhaps four weeks. I could not say for certain.
“X-Q. 33. Do you mean complete ones like this one, marked for identification, that I show you ?
“A. Yes, sir.
“X-Q. 34. Where did you see them ?
“A. The foreman of the porcelain works showed some samples of porcelain also.
*487 “X-Q. 35. Did you see some of these complete then; cross parts and all ?
“A. Not in my department; some that were outside, in the shops.
“X-Q. 36. What were they doing with them in the shops?
“A. Use them for extension and line connections.
“X-Q. 37. You mean plugs like this in this office ?
“A. Sometimes there is no light over a machine, and extensions are in use from another line to transfer over the light.
“X-Q. 38. So, then, two or three months after you delivered the molds, you saw these attaching-plugs in practical use about the shops.
“A. Yes, sir.
“X-Q. 39.' They were then used just about the same way that they were used today ?
“A. The same way.
“X-Q. 40. And, as I understand you, those attaching-plugs that you saw used around the shops in the spring of 1896 were actually like this one marked for identification, which I have shown you ?
“A. Yes, sir; just like it.
“X-Q. 41. How many do you suppose you saw that spring around the shops — not exactly, but somewhere near?
“A. I could not say: There were very many around the shops.”
In the course of the direct examination of the witness Wirt, in answer to question 3, among other things, he states, “that he believes the model of the attaching-plug was made about January, 1895. After the model was completed a drawing was made, and instructions were given to the shop to make up samples. The time required to make the molds for getting out the porcelain is some four to ten weeks, according to whether the work is urgent or not. It is our practice to make up a few samples of porcelain before an article goes into production. Porcelain samples of this *488 device were submitted to me for examination and approval. The dies for making the metal parts were manufactured also about this time. It is our practice to manufacture large quantities of any new device of this character, thus accumulating a stock before the device is offered for sale. We are also obliged to take extreme care to see that our stock of old devices is exhausted before shipping the new device, which takes the place of the old device. I can not tell exactly when the first of these new attaching-plugs were shipped to our customers. I believe, however, we made the first shipments about January, 1896. These were shipped to our local offices, and when the stock of the old-style glass plugs was exhausted at local offices these'were sent to customers.”
Without quoting more from the evidence, it is very manifest from what we have recited, that the design of the attaching-plug for which patent is sought, was invented and produced as a complete article of manufacture, and, as such, was put into use in the shops of the General Electric Company, at Schenectady, N. Y., more than two years prior to the filing of the application by the appellant. The shops of the company were many, and the hands employed therein were numerous; and the article for which patent is claimed, was openly in use in the shops of the company, the assignee of the invention, without the slightest injunction of secrecy upon any one, from the spring or early part of the summer of 1896, continuously on to the present. The use was not only open to the employees of the company, but also to any portion of the public that might desire to see and inspect it. Such use was a public use in the fullest sense of the patent. law.
In the case of Smith, & Griggs Manf. Co. v. Sprague, 123 U. S. 249, 256, the nature of the use that is allowable for purposes of experiment, and the nature of the use that will be regarded as public and constitute a bar to the right to obtain a patent, is fully explained by the Supreme Court. *489 In that case it was said by the court, that a use by the inventor, for the purpose of testing his machine, in order by experiment to devise additional means for perfecting the success of its operation, was allowable without affecting the validity of the patent; and where, as incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character. But where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principal and not the incident must give character to the use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment. Where the substantial use is not for that purpose, but is otherwise public, and for more than than two years prior to the application, it comes within the prohibition.
In that case several of the leading cases upon the-subject are referred to and quoted from; and in reference to the character and degree of proof required, where the objection to the right to the patent is a public use for more than two years prior to the application therefor, the court said :
“In considering the evidence as to the alleged prior use for more than two years of an invention, which, if established, will have the effect of invalidating the patent, and where the defense is met only by the allegation that the use was not a public use in the sense of the statute, because it was for the purpose of perfecting an incomplete invention by tests and experiments, the proof on the part of the patentee, the period covered by the use having been clearly established, should be full, unequivocal and convincing.”
In the present case, if it were conceded that experimental use could be set up to answer the objection of a public use for more than two years prior to the application, the proof on the part of the applicant falls far short of the requirement of the rule laid down in the case just cited. Indeed, the proof shows clearly that there was a public use of the article *490 invented for more than two years prior to the application; and it is not easy to resist the conclusion that the application was a mere afterthought, the principal object of which was to defeat the patent that had been granted to Seymour.
It is our opinion that the decision of the Assistant Commissioner, from which this appeal was taken, was right, and must therefore be affirmed; and it is so ordered.
And it is further ordered, that the proceedings in this case, and this decision thereon, be certified to the Commissioner of Patents to be entered of record as directed by law.

Decision affirmed.