**STILSON TOOL, INC., Plaintiff,**

v.

**ASSOCIATES MACHINE CO., Harold P. Freeman & James P. Freeman et al., Defendants.**

Civ. A. No. 24858.

United States District Court
E. D. Michigan, S. D.

April 19, 1967

Bernard J. Cantor, of Cullen, Sloman & Cantor, Detroit, Mich., for plaintiff.

William T. Sevald, Royal Oak, Mich., Carl F. Schaffer, Toledo, Ohio, of counsel, for defendants.

## OPINION

TALBOT SMITH, District Judge.

In this case the plaintiff, Stilson Tool, Inc., a Michigan corporation, seeks a declaration that the patent of defendants Associates Machine Co., a sole proprietorship, Harold P. Freeman and James P. Freeman (deceased)[1] is invalid and it prays injunctive relief. The defendants have asserted that plaintiff has infringed their patent and have counterclaimed for such infringement.

The patent in suit, United States Letters Patent No. 3,090,614 was filed March 16, 1961 and was issued May 21, 1963, to Harold P. Freeman and James P. Freeman as joint patentees. In its simplest terms the patented article is a holder, into the end of which is inlaid and welded a wear-resistant carbide wafer called a "grip". It is intended to grip, or hold, another article. The holder may, for example, be mounted in a chuck jaw by a screw threaded into a hole in its other end, the carbide wafer coming into contact with, and gripping the piece being

1. This patent is now owned jointly by defendants Harold P. Freeman and Hazel C. Freeman who have succeeded to the interest of James P. Freeman.

worked upon. Later, when the wafer becomes worn, the holder is removed and replaced.

The plaintiff's device (known as an "Adjusto-Jaw") includes a bolt, in the end of which is inlaid a wear-resistant carbide wafer. The defendants charge such bolt with infringement, and the plaintiffs admit that the patent-in-suit, if valid, is indeed infringed by such bolt of its Adjusto-Jaw device.

The controversy turns principally upon the attachment of a wafer to a holder. So far as this record discloses such attachment may be accomplished in either of two ways:

a) It may simply be fastened *on top of* the end of a holder, much as a reinforcing patch may be sewed onto the elbow of a coat; or

b) It may be inlaid *into* the end of the holding device, much as a filling, sometimes spoken of as an "inlay", is placed in, not on, a cavity in a tooth. (The latter terminology, in fact, is adopted in this field. The first method of fastening, a) as above, is called an "onlay", whereas the second, b) is termed an "inlay.")

It is one defense of the plaintiff (to the infringement charge) that the patent-in-suit is invalid for obviousness. More specifically that it does not represent invention at all, but rather the employment of a routine, well-known, and obvious expedient, shown by many past examples thereof in the prior art. It is alleged that examples of the prior art introduced into evidence provide ample proofs thereof.

We turn, then, to the prior art. The two most significant examples cited are the "Budd device" and the "Pontiac device." The Budd device was a replaceable throw-away holder having a carbide wafer or tip brazed upon (but not "inlaid in") one end. Just as in the Freeman patent, a threaded hole was provided in the opposite end of the holder, to permit the unit to be removably mounted by means of a screw into a chuck or work-holding device. In this Budd device, the circular carbide wafer was butt brazed upon the end of a holder of equal diameter. As noted above, we will refer to this fastening technique, for convenience, as "onlaying".

■ (The actual use of the Budd device in a work holder or chuck is illustrated in the Nicosia patent, U. S. Patent No. 3,151,862, granted October 8, 1964 on a patent application filed August 8, 1961. This Nicosia patent, we might note, is not itself prior art, since it was filed subsequent to the patent-in-suit, but it is relevant for its showing of the prior art "Budd device," and the manner of use contemplated for the Budd device.)

■■ In December of 1959 and during 1960, more than one year before the filing date of the patent-in-suit, Freeman, as part of his company's ordinary carbiding and brazing services, had carbided 50 pieces, purchase-ordered by Budd, invoiced by Freeman to Budd, recorded in Freeman's sales ledger and paid for by Budd. An effort had been made in the briefs to dub the Budd-Freeman transaction as "experimental" only. The effort is unpersuasive. It is well established that the burden of showing experimental use by proofs "full, unequivocal, and convincing" is upon defendant under such circumstances as here presented. Smith and Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141. Here the transaction was within Freeman's regular business services, an ordinary commercial transaction, or "on sale" prior art under Section 102 (b).

It is clear upon the record that the only difference between this Budd device of 1959 and that of the Freeman patent-in-suit is that Freeman's carbide wafer, or tip, is inlaid into the holder, whereas in the Budd device, the wafer is simply onlaid upon the end of the holder. It should be observed at this point that Freeman, himself, admitted that he does not claim to have invented the idea of counterboring, or creating a socket for an object, and then inlaying or brazing a carbide wafer into it. This idea was

not new with him. Mr. Freeman admitted that he merely adopted and used an old inlaying technique because he thought it was the cheapest and most convenient method for mounting a carbide wafer upon the holder. We find that there was nothing unique about the plaintiff's inlaying technique. Plaintiff Stilson testified that it was in common use in the cutting tool industry in 1952, in which he was then engaged, a commonly and generally known expedient in the mechanical arts, notorious and widely used.

We note, moreover, with respect to the Budd device that we are not impressed with the effort made to exclude Budd from consideration as prior art, on the ground that Mr. Freeman really "invented this" prior to the December, 1959 transactions above referred to. Not only is the testimony at best vague and inconclusive but it lacks the degree of corroboration required to establish a date of conception or invention prior to the March 16, 1961 filing date. United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 77 F.2d 263 (2 Cir. 1935); Rooted Hair, Inc. v. Ideal Toy Corp., 329 F.2d 761 (2 Cir. 1964), citing Oliver Machinery Co. v. Gellman, 104 F.2d 11 (6 Cir. 1939), cert. den. 308 U.S. 567, 60 S.Ct. 80, 84 L.Ed. 476 (1939).

The "Pontiac device" makes substantially the same showing. In drawings (plaintiff's Exhibits 11 and 12) made by the Pontiac Motor Division of the General Motors Corporation there is shown a gripping device essentially identical with the Budd device. It was in commercial and public use in 1954 and subsequent years. The construction and use of the Pontiac device (an example of which was introduced into evidence as plaintiff's Exhibit 13) was described by Mr. Thomas E. Seavey, an employee of Pontiac Motor Division who had served as General Master Mechanic of the Pontiac plant during the period when this device was first used in such plant. The Pontiac device consists of a cylindrical holder on the end of which is onlaid or brazed a carbide wafer. These throwaway holders or grippers were used in a chuck which formed part of a machine used for turning camshafts for the Pontiac V–8 engine, starting in June of 1954. These have been in continuous production for commercial use at the Pontiac plant since that date. This Pontiac device is further described and illustrated in the Van Dinen Patent, U. S. Patent No. 2,-852,265, granted September 16, 1958, and owned by the General Motors Corporation. The specification of this patent indicates that "Adjustable friction or traction surface plugs 32 are mounted within the jaws to minimize wear of the driven jaw member".

As in the case of the Budd device, not only Mr. Freeman, but defendants' expert Staples both testified that the only difference between the Pontiac gripper and the gripper of the Freeman patent-in-suit is that the carbide wafer of the Pontiac device is onlaid upon the end of the holder, whereas the carbide wafer of the Freeman patent-in-suit is inlaid into the holder. Otherwise, the two grippers are identical for all practical purposes.

The patentee identified the difference between his device and the aforedescribed Budd device in the following terms:

"A. Well, the difference would be, as I repeated twice before in the last few minutes, the carbide pad is mounted within a steel container, and it is bonded by silver brazing material which protects the carbide. It is a deep counterbore. It is counterbored so that nothing protrudes from the steel cup other than the serrations.

Q. And that is what you say is the difference between the patent and the device you made for Budd?

A. Yes."

But the patentee admitted that he did not invent this feature (Tr. 116):

"Q. And you selected the countersink or inlaying method because it was the cheapest way and seemed to be the most convenient way of

locating the carbide; isn't that correct?

A. It seemed the best way, yes, after testing.

    \*    \*    \*    \*    \*    \*

Q. You didn't invent that way? You simply adopted it and used it here on the throw-away gripper, isn't that right?

A. Yes, I would have to agree with you."

There can be no doubt that it was a common practice in the industry for many years prior to Mr. Freeman's device to inlay and braze a carbide cutting tool into a recess or socket in the holder element. Thus we find of particular interest the following extract from page 1626 of "Machinery's Handbook".[2] Under materials captioned "Soldering and Brazing" we find the following:

"BRAZING CARBIDE TIPS TO STEEL SHANKS—Sintered carbide tips or blanks are attached to steel shanks by brazing. \* \* \*

SHANK PREPARATION: *The carbide tip usually is inserted into a milled recess or seat,* but some prefer to omit the recess and braze the tip to the top of the shank. When a recess is used, the bottom should be flat to provide a firm even support for the tip." [Emphasis by Court]

Many prior art patents show the inlaying technique for securing a wear-resistant element into a holder. From them (as well as the Machinery's Handbook, supra) it is clear that those skilled in the art, prior to the alleged invention of the patent-in-suit, were knowledgeable of the technique of inlaying hard brittle materials, such as carbides and the like, into sockets formed in holders. Although the above group of patents represents a variety of fields of use of wear-resistant materials, such as gauge contact points, drills, grinders, and bearings, as well as grippers, each of them represents and discloses a solution to the problem of mounting a carbide or similar wear-resistant element into a supporting member. Each of them shows that there is nothing novel in the concept and technique of inlaying a wear-resistant element into its supporting element. It is not necessary to discuss each of these prior art patents in detail, since the inlaying technique involved is self-evident from the drawings of the patents.

The defendant urges that one superiority of the inlaying technique employed by him over the onlaying technique is that the former protects and supports the flat surface and side walls of the carbide element. There is no doubt that this is true, but it represents no advance in the art, nothing new or original. The Ridgway patent (No. 2,027,788), for example, specifically recognizes and discusses the necessity for adequately protecting brittle materials such as carbide. The employment of the inlaying technique to prevent the lateral shifting of the inlaid element, and to protect it against lateral forces has been a matter of common knowledge for years.

Defendant vigorously attacks much of the prior art as non-analogous, pointing out that some of it relates to such diverse objects as abrasive inserts for tires, or abrasive inserts for gauges, or drills. But the point sought to be made here goes to the ancient use of the inlaying technique, and to the point that its application to a gripping device is merely a routine mechanical application to still another type of holder. The prior art may most usefully be categorized as follows:

a) The Pontiac (1954) and Budd-Freeman devices (1959) involving grippers. The only difference between these grippers and the patent-in-suit is in the use of an onlay technique rather than an inlay technique. Each technique was equally old, equally well established, in the art.

b) Prior art showing the widespread use of inlays. That many of these uses were non-gripping in nature does not impeach the notoriety of the

**2.** 15th Edition, 1957, Plaintiff's Exhibit 3

inlaying technique. Actually, inlaying is a common alternative to onlaying. See Machinery's Handbook, supra.

■ It is clear that there is nothing new in the claimed subject matter, being composed of elements old and well-known. So far as their combination is concerned, we are keenly aware of both the blessings and the hazards of hindsight. Thus we have viewed the prior art "from the point in time just prior to when the patented device was made." Monroe Auto Equipment Co. v. Heckethorn Mfg. and Sup. Co., 332 F.2d 406 (C.A. 6, 1964). Bearing in mind the scope of the prior art, the differences between such art and the claims at issue, and the level of ordinary skill in the pertinent art, we summarize our conclusions as follows:

a) The record in this case makes it abundantly clear that tungsten carbide-tipped removable or throw-away grippers were old devices. The prior art Pontiac and Budd removable grippers both utilized a wafer-shaped carbide tip brazed upon a holder or supporting element. Neither of these two prior art devices was before the Patent Office Examiner when he allowed the Freeman patent application.

b) The only difference between the prior art Budd and Pontiac grippers, and the Freeman-claims-at-issue, is in the technique used for fastening the carbide tip to the holder. Freeman uses the inlay technique, wherein the tip is inlaid into the holder. Both Budd and Pontiac used the "onlay" technique, whereby the tip is butt brazed upon the end of the holder.

c) The prior art is replete with instances of carbide or other hard wear-resistant tips fastened upon a holder by inlaying, and shows this to be an old technique.

d) Those skilled in the art of securing hard wear-resistant tips upon supporting members, whether for use in chucks, gauges, drills, grinders, bearings or tire grips, (some of which are involved in the prior art patents) all recognized that a desirable fastening technique was the well-known inlaying technique. Both the inlaying and the onlaying techniques are specifically suggested as alternatives, for securing carbides to holders, by Machinery's Handbook, a standard reference work for engineers, designers and mechanics in the mechanical industries.

e) The Court therefore concludes that it was obvious for Freeman to adopt the well-known and widely used inlaying technique as a substitute for the onlaying technique employed for fastening the carbide tips to the prior art Budd and Pontiac removable grippers, and therefore holds that the Freeman patent is invalid for obviousness under U.S.C. 103.

■ There is an additional ground of invalidity. It is clear that the Freeman patent-in-suit is invalid under T. 35 U.S. C. § 102(b), which provides that a bar to the validity of a patent arises if the patented subject matter was in public use or on sale in this country more than one year prior to the filing date of the United States patent application. The record shows, and we have described in some detail, the Budd-Freeman transaction of December 1959 and 1960, a routine commercial operation performed as a part of Freeman's regular business services. Although the Budd device differed from the device of the Freeman patent to the extent that the inlaying technique for fastening was substituted for the onlaying technique, the law is well settled that a patent which claims an obvious and trivial variation of a prior device is barred by the use or sale of such prior device more than one year prior to the filing date. Smith and Griggs Mfg. Co. v. Sprague, supra. See, also, the application of this doctrine in the case of Tool Research and Engineering Corp. v. Honcor Corp., 367 F.2d 449 (C.A. 9, 1966), where the Court held the patent invalid because of a prior public use of a similar

but admittedly slightly different method. This Court also finds the Freeman patent-in-suit invalid since barred by a prior public use and sale under T. 35 U.S.C. § 102(b).

The Freeman patent-in-suit being invalid and unenforceable this Court finds that plaintiff is entitled to a permament injunction against the defendants, enjoining defendants and those in privity with them from notifying plaintiff and plaintiff's customers and potential customers of alleged infringement of Freeman Patent No. 3,090,614 on account of products herein ruled upon, manufactured and/or sold and/or used by plaintiff. A suitable decree may be presented.