GUY et al. v. STEIN.

(Circuit Court of Appeals, Seventh Circuit. December 7, 1916.)

No. 2366.

1. PATENTS ⚙══328—VALIDITY—MINER'S LAMP—PRIOR PUBLIC USE.
   The Guy patent, No. 1,097,716, for a miner's carbide lamp, *held* invalid for public use of the invention by persons to whom it was supplied by the inventor for more than two years before application for the patent.

2. PATENTS ⚙══81—VALIDITY—PRIOR USE—BURDEN AND MEASURE OF PROOF.
   Proof of prior public use, to defeat a patent, must be very clear and beyond a reasonable doubt; but, when such public use is clearly shown, the burden is cast upon the patentee to establish the fact that it was experimental.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 104.]

⚙══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern Division of the Southern District of Illinois.

Suit in equity by Frank Guy and George R. Shanklin against Meyer Stein, doing business as the M. Stein Manufacturing Company. Decree for defendant, and complainants appeal. Affirmed.

Samuel W. Banning, of Chicago, Ill., for appellants.

John W. Hill, of Chicago, Ill., for appellee.

Before KOHLSAAT, MACK, and EVANS, Circuit Judges.

KOHLSAAT, Circuit Judge. [1] The only question here involved is whether certain seemingly public uses were in fact such or merely experimental. The device in suit is the miner's carbide lamp of patent No. 1,097,716, granted to F. Guy on May 26, 1914, upon an application filed March 1, 1911. The new element in the lamp, so far as is here concerned, was the so-called Guy dropper valve.

Claim 1, which is typical of all the claims, reads as follows, viz.:

In an acetylene lamp, in combination with a lamp body, comprising a water chamber and a carbide chamber, a stationary tube in communication with the water chamber and having one terminal within the carbide chamber, a valve stem adapted to rotate and move longitudinally within said tube, and a valve rigid on the valve stem and having a face adapted to engage and grind on the terminal of the tube within the carbide chamber.

Fig. 2 of the drawings is herewith reproduced:

Fig. 2.

Acetylene gas is produced by the chemical union of water with calcium carbide. As will be seen from the drawing, the water chamber is arranged above the carbide chamber and carries both the water supply tube and the valve stem and head; the carbide chamber being detachable. The water supply tube extends from above the casing top into the gas or carbide chamber. Through this tube extends the valve stem, terminating in an operating handle above the casing and having an adjustable screw connection with a threaded socket in the upper part of the water tube, whereby the valve head below the lower end of the water tube can be adjusted up or down at pleasure, opening or closing the lower end of the water tube, and at the same time affording a rotary grinding motion to the valve head upon the seat, whereby, the patentee claims, the valve and seat are kept free from sediment and other clogging substances.

[2] It appears from the admissions of Guy shown in the record that he had hit upon the substantial idea of the invention and reduced it to practice as early as 1906, but had not yet reduced it to commercial form, especially as to shell or outward form. His first lamp was too cumbersome. His next was contained in a shaving soap box and was too small. There seems to be no doubt that he had completed the device as contained in his dropper valve as early as 1906 or 1907, but was seeking to have it tested. As it turned out, he made no substantial changes in the dropper after that date, but only in the housing thereof. The principle of the device was completely developed, so far as here involved. As above stated, the only controversy before us is: Did Guy make or permit to be made public use of his lamp more than two years prior to filing his application for a patent, or before March 1, 1909? Proof of that fact, in order to prevail, must be very clear and beyond reasonable doubt. Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co.; Same v. Norwood and Same v. Wiler —the barbed wire patent—143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; Mueller Mfg. Co. v. Glauber, 184 Fed. 609, 106 C. C. A. 613; Moline Plow Co. v. Rock Island Plow Co., 212 Fed. 727, 129 C. C. A. 337; Mast, Foos & Co. v. Dempster Mill Mfg. Co., 82 Fed. 327, 27 C. C. A. 191; Taigman v. Forsberg, 223 Fed. 790, 139 C. C. A. 607.

The trial judge decided the case practically upon the admissions of the appellant, finding that Guy himself had placed the lamp in public use more than two years prior to filing his application for a patent, and that the patent was therefore invalid. It was the patentee's contention that the acts upon which the District Judge rested his decision were merely experiments made in testing out the invention. One feature which he was anxious to attain was a steady flame. This he had accomplished as early as 1907 by extending the tube and valve stem into the carbide. Indeed, there remained after the year 1907 nothing but the lamp shell and the commercial features to be adjusted. There were a number of miners' lamps in existence in 1906. Guy appropriated the shell of one called the barrel and of one made by one Bleser. The exact date of the application of the Guy dropper to these shells is somewhat uncertain.

The acts alleged to constitute public use may be summed up as follows: In 1908 Guy remodeled a Bleser lamp and gave it to his brother. This he repaired several times. Afterwards the brother procured two more, under instruction not to let any one see them. This first lamp was made under the patent. Guy testified that he asked his brother to give it a thorough test. It was used by his brother for two years in a mine. Guy then made and gave one of his lamps to a friend named McGuire. This, Guy claims, was to be returned when tested. It was never returned. Then, as he first testifies, he sold one lamp to a friend named Dant for $1 in 1908. This date he changes to 1909 subsequently, which would bring the transaction within the protected period. It was to be returned, but never was, though brought in for repair several times. In explanation of his acts in letting the lamp

pass out of his hands, he stated that he wanted the news to spread that he had something good in the way of carbide lamps. This lamp was sold Dant for testing, Guy claims. When asked how he expected the news of his lamp to spread he said:

I visited every day in that mine, met 100 or 150 men; all the men in the mine saw me many times using these lamps, and they made remarks about how nice and steady that lamp burned. Now, there, the news traveled all over the country right there; miners change places—go from one part of the country to the other, all over the United States; some wanted to see the dropper. I would unscrew the lamp and show them the dropper; they could see there was a difference in the dropper, and it became known that Guy had a dropper—it was called a dropper—that was a good deal different and a good deal better than any other; then it brought about a demand for it. X-Q. 109. So that, when you carried, for instance, this one into the mine, they saw you had a successful carbide lamp; these 100 men or more in the mine would gather around and ask you about it, and you told them it was a carbide lamp, and disconnected and showed it to them? A. Yes, sir. X-Q. 110. You went to other mines, did you? A. I believe I did; I worked in the Klondike Mine all the time, but I believe it burned down once. X-Q. 111. These other men you gave samples of the lamp to, did they do the same way? Did miners ask them about the lamp? Did they show them the dropper? A. Don't think they showed them the dropper; at least I instructed them not to. X-Q. 112. You did that yourself? A. Yes, sir; I feared, if they should get it, they would take it in their hands and get a closer view; but still they would not have seen much. X-Q. 113. You was seeking to get a general demand for Guy's dropper, so you could build up a business? A. No, sir. X-Q. 114. Didn't you calculate to build up a business? A. No, sir; my object was to take up a patent and sell the patent. X-Q. 115. But you did want to get inquiry as to Guy's dropper, so there would be a demand for it? A. Wanted to make a reputation for Guy's dropper. X-Q. 116. You made one for your brother, and he took it down and tested it in 1908, I believe? A. That is this identical one here that is marked "Complainants' Exhibit Remodeled Bleser Lamp with Guy Dropper." X-Q. 117. Did he show it to the boys down there? A. I don't know; I cautioned him not to.

In an affidavit filed with his application for the patent in suit he says:

The first lamp embodying my invention was completed and used by me in Klondike Mine, Springfield, Ill., about February 1, 1907. Afterwards numerous other lamps embodying my said invention were used by other miners at different times in mines at Springfield, Ill.

Early in 1909 Guy gave a lamp embodying his invention to one John Robson. About November, 1909, Guy took out a patent upon another lamp, which used no valve. Guy says his lamp was known all over the United States. He received orders for it, but replied that he was not making lamps. Martin W. Moore testified he made a lamp like Guy's in 1908, except that the valve was tapered and not flat. He saw the Guy lamp first in 1910. He took out a patent August 12, 1913, on an application filed May 6, 1912, No. 1,070,352, for his lamp with a tapered valve. One Jacaway testified he took a miner's lamp to Moore to be fixed early in 1908. The lamp was produced in court. It involved the principle of Guy's lamp. Moore took out a slide wire and put in a Guy stem valve feed.

There is evidence to show that defendant Stein was repairing lamps for different miners and inserting Guy droppers in 1908. One Denton says he used several of the devices with the Moore or tapering valve in 1907 or 1908. A coal miner by the name of Luscher says he used a lamp produced in evidence as the Luscher lamp in 1908, at the Sangamon, Ill., Coal Company's mine. This lamp he purchased at a store in Springfield and used until it sprung a leak. The lamp seems to have a flat valve head. The valve stem seems to be shorter than Guy's. It discloses no evidence of having been broken off, as claimed by the witness. In other respects it follows Guy. He claims to have seen "lots of fellows" using them. J. A. Thomas, a miner, testified that he had his lamp supplied with a Guy dropper in or prior to 1908. He was told by the man who took his lamp to be repaired that Guy was putting in the dropper himself for 50 cents. C. J. Lemasters, a miner, testified he bought a Guy lamp from Guy in 1907. He testified that he used it about one year at the Devereaux mine at Springfield, Ill. He identified the lamp produced as the one he bought. Guy himself says:

"I have loaned lamps, 10 or 15, to McGuire; maybe 8 or 10, and he would use them that day and return them to me. I never sold a lamp to McGuire. * * * I don't call to mind all the lamps I let the men use."

He kept up the habit of showing his lamp right along through four or five years and explained it at different times to various people.

The Moore device, which, was substantially the Guy device, differing only, as aforesaid, in that its valve was conical instead of flat, was being freely and publicly used in 1908. Several witnesses testified to this fact. Moore would fix over miners' lamps, inserting his tapered valve with the Guy valve stem, making a charge of 50 cents therefor. Thus it appears that little effort was made for several years to protect Guy's invention. The device was not one which required years of experimenting. It was simple and easily comprehended. It could not be repaired without disclosing its construction. No reason appears why Guy should not have availed himself of the benefit of the patent statute at once, rather than indulge in several years of delay.

Appellants attack the credibility of the various witnesses, and it may be that in several instances the latter have fixed a date earlier than the true one; but it is difficult to conceive that in the multitude of instances adduced the witnesses have generally been in error. No ulterior motive is discoverable. The whole atmosphere of the case leaves the clear impression that the device was well known and freely used in public as early as 1908. When once the public use is shown, the burden is cast upon the patentee to establish the fact that such use was experimental. Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 249, 8 Sup. Ct. 122, 31 L. Ed. 141; Eastman v. Mayor of New York, 134 Fed. 844, 69 C. C. A. 628; Root v. Railroad, 146 U. S. 210, 13 Sup. Ct. 100, 36 L. Ed. 946; Worley v. Tobacco Co., 104 U. S. 340, 26 L. Ed. 821; Swain v. Holyoke Machine Co., 109 Fed. 154, 48 C. C. A. 265; Star Mfg. Co. v. Crescent Forge & Shovel Co., 179 Fed. 856, 103 C. C. A. 342.

One may not, by merely calling a use experimental, practically make such a full public demonstration of his patented device as to create a market for it and bring it to the notice of the trade without protecting himself as provided by statute. There must be diligence. The delay must be plainly justified by the circumstances. While Guy may have intended not to disclose his invention, it is evident that it was publicly practiced and that he was receiving the benefits by way of creating a market for it in 1908.

Courts are not slow to give an inventor the full results of his exploits in the realm of invention, but the same law which thus protects him requires that he use diligence in protecting himself. He should apply for his patent within reasonable time and not rely on unnecessary so-called experimentation to prolong the statutory period. In the the present case we are unable to get away from the conviction that his reliance upon the immunity of experimentation was not justifiable.

The decree of the District Court is affirmed.