## SOUTHERN NOVELTY CO. v. ECONOMY CONE & TUBE CO.

(District Court, E. D. North Carolina. December 8, 1923.)

No. 95.

1. **Patents ☞81—Burden of proof to show public and experimental use.**

In a suit for infringement of a patent, wherein defendant denied validity of patent, in view of Rev. St. §§ 4886, 4920 (Comp. St. §§ 9430, 9466), the burden of proof was on defendant to establish its defense of prior public use, but when public use was shown the burden of proof was cast on the patentee to establish the fact that such use was experimental.

2. **Patents ☞75, 76—Principles applied in determining whether patent invalid by reason of prior use.**

A use of a machine by the inventor, for the purpose of testing it, in order, by experiment, to devise additional means for perfecting its operation, does not invalidate subsequent patent, and when, as incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but when the use is mainly for the purposes of trade and profit, and the experiment is merely incidental, the principal, and not the incident, must give character to the use, under Rev. St. §§ 4886, 4920 (Comp. St. §§ 9430, 9466).

3. **Patents ☞81—Burden of proof to show invalidity by one working for owner of patent.**

That defendant in suit for infringement was employed for years by plaintiff, in which company he bought shares, and advised patentee's widow to sell her interest in the patent to plaintiff, while it did not estop defendant from attacking the patent on the theory of prior use, did impose on him the duty to establish his allegation by testimony clear, cogent, and convincing.

4. **Patents ☞328—Smith patent, No. 886,884, valid and infringed.**

Smith's patent, No. 886,884, covering the manufacture of paper cones for yarn-winding machines, *held* valid and infringed.

In Equity. Bill by the Southern Novelty Company against the Economy Cone & Tube Company. Decree for plaintiff.

Rountree & Carr, of Wilmington, N. C., and Watson, Coit, Morse & Grindle, of Washington, D. C., for plaintiff.

Bynum & Henry, of Rockingham, N. C., and Prentiss, Stone & Boyden, of Washington, D. C., for defendant.

CONNOR, District Judge. The bill, answer, evidence, and exhibits disclose the following case:

Plaintiff is a South Carolina corporation, with its principal office and factory at Hartsville, S. C. Defendant is a corporation, with its principal office and factory at Rockingham, N. C. The suit is brought under and pursuant to the provisions of section 4921, Revised Statutes, 7 Fed. Stat. Anno. (2d Ed.) 326, as amended (Comp. St. § 9467), for the infringement of letters patent No. 886,884, granted in the name of Walter F. Smith, May 5, 1908, upon an application filed December 19, 1907, covering the manufacture of paper cones for yarn-winding machines, which, by assignments, prior to the filing of the bill herein, became the property of plaintiff.

Defendant, in its answer and upon the hearing, admits that the paper cone, described in the letters patent and exhibited on the hearing, was

patentable, and that an application therefor was filed in the Patent Office at Washington, D. C., in accordance with the provisions of the statutes of the United States, December 19, 1907, and that letters patent were issued in accordance with the application, May 5, 1908, in the name of Walter F. Smith, as alleged in the bill, and that by duly executed assignments the said letters patent, with all of the rights thereto, are vested in the plaintiff. Defendant further admits that it has, prior to the filing of the bill, and is at this time, engaged in the manufacture and sale of paper cones of the same design, and in all respects similar to those described in, and covered by, said patent No. 886,884. It denies that, in the manufacture and sale of said cones, it has infringed any legal right of plaintiff in respect to said letters patent, for that it denies that plaintiff has any exclusive rights to the use of the "blanks" used in manufacture of said cones. Defendant avers that it has a perfect legal right to use "blanks" of the kind shown in the Smith patent, if it so desires, for the reason that said patent is not valid, because the patentee violated the explicit requirement of the statute, for that the "blanks" used in the manufacture of said cones were in public use, or on sale, for more than two years prior to the filing date of the application resulting in said patent, as provided by section 4886 of the Revised Statutes, 7 Federal Statutes Anno. (2d Ed.) (Comp. St. § 9430).

The statute provides that:

"Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of any matter, or any new and useful improvements thereof, not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and not in public use or on sale in this country for more than two years prior to his application, * * * may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor."

It is provided by section 4920, R. S. 7 Fed. Stat. Anno. (2d Ed.) 309 (Comp. St. § 9466), that in any action for infringement of a patent, the defendant is permitted, in his answer, having given notice thereof, for more than 30 days, to prove, on trial, that the article patented had been in public use, or on sale in this country, for more than two years before his application for a patent was filed, etc.

[1] Upon the issue raised by the pleadings herein, it is settled that:

"The burden of proof is upon the defendant to establish this defence. The grant of letters patent is prima facie evidence that the patentee is the first inventor of the device described in the letters patent, and of its novelty. Not only is the burden of proof to make good this defence, upon the party setting it up, but it has been held that 'every reasonable doubt should be resolved against him.'" Cantrell v. Wallick, 117 U. S. 690, 6 Sup. Ct. 970, 29 L. Ed. 1017, citing Smith v. Goodyear, Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952; Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939; Coffin v. Ogden, 18 Wall. (85 U. S.) 120, 21 L. Ed. 821.

So it is said:

"In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them. * * * Courts have not only imposed upon defendants the burden of prov-

ing such devices, but have required that the proof shall be clear, satisfactory and beyond a reasonable doubt." Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154; W. W. Sly Co. v. Central Iron Works, 246 Fed. 707, 158 C. C. A. 663, and other illustrative cases.

It is further held that, when the public use is shown, the burden of proof is cast upon the patentee to establish the fact that such use was experimental. Guy v. Stein, 239 Fed. 729, 152 C. C. A. 563, and cases cited in opinion.

[2] The principles upon which the question whether a patent is invalid by reason of prior use for two years before the filing of the application is to be decided is clearly stated in Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 249, 8 Sup. Ct. 122, 31 L. Ed. 141, in which it is said:

"It is perfectly true that a patentee cannot be permitted to use for profit a machine which embodies a perfected invention for a period of two years or more, and then obtain a valid patent for the old machine by means of the addition of some new improvements, which, in the language of Judge Lowell, 'were intended to benefit the patent rather than the machine.' * * * A use by the inventor, for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principal and not the incident must give character to the use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment. Where the substantial use is not for that purpose, but is otherwise public, and for more than two years prior to the application, it comes within the prohibition."

The testimony shows clearly that the patentee, W. F. Smith, had for several years, as probably others interested in securing a cone for use in cotton mills, been endeavoring by experiments to secure a "blank," so cut that the cone could be perfected—that is, made ready for use— by a single operation. It is manifest that changes in the "blanks" could only be tested by experiments. Walter F. Smith, who it is conceded invented and perfected the cone, or rather the "blank," worked in plaintiff's cotton mill and then made the experiments. It is conceded by W. H. McCall, president of defendant company and principal witness for defendant, that Smith was a man of high character. His affidavit made in applying for the patent is strongly persuasive that he stated the truth. His death, prior to any suggestion that his patent was invalid, for the reason now assigned, places upon the defendant, whose president was familiar with the course pursued by Smith, a heavy burden to invalidate his patent. It is proper also to bear in mind the fact that the application for the patent was filed December 19, 1907, when Smith made affidavit that:

"He does not know and does not believe that the same (the said invention) was ever known or used before his invention or discovery thereof, or patented or described in any printed publication in any country before his invention or discovery thereof, or more than two years prior to this application, or in public use or on sale in the United States for more than two years prior to this application."

The patent was granted May 5, 1908. The president of defendant company was at that time, and for several years prior thereto had been, employed by plaintiff company at Hartsville, S. C. He remained with the plaintiff, Southern Novelty Company, until 1919, and was looking after the manufacturing of cones and tubes—

"really as what you might call superintendent. In 1903, they were winding most of the cones by hand, with girls, on a machine, rolling them on a spindle. They were working on a machine for making cones at that time. That machine—they started that machine—the first month's production was June, 1903. We made 311,500 cones for the month of June with that one machine. The cones were removed from the mandrel and, cut as a separate operation. This was continued until—I could not say 1904, but will say 1905. We made some changes before 1905. As well as I remember in 1905, we were cutting them automatically, just as they were made, as they came from the machine, while on the machine."

He is shown a finished cone, and asked to examine it, and state whether or not it was similar to the cones made by the Southern Novelty Company in 1905. He says:

"The tongue is similar to those as they were making them in 1905. I mean the form, the way the pattern was cut." He fixes the year 1905 by reference to having executed a mortgage in 1905. "That's why I went back. That's the only thing I have. We were making them, I am satisfied, long before then, but I wanted to have something to fix in my mind. This is the only reason I say in August, 1905." He says that he ascertained the date of the mortgage by going to Darlington and got the clerk to look up the record "last week," before he testified. "My impression, but I was sure I didn't know exactly the time. That is why I went there to get the actual date. I wasn't sure I knew it was in that year. That is why I went over there to be sure."

The proposition to be maintained by the defendant company is that the cones, or blanks used in making them, were in public use, or on sale, in this country for more than two years prior to Smith's application for a patent—that is, prior to December 19, 1907, or on December 19, 1905. The witness remained in the employment of plaintiff company until 1919, when he left, as he says, "because he had a right to do so," which is conceded. He began making cones which are conceded to infringe the patent, if valid, within two years after leaving plaintiff's employment. Walter F. Smith died in 1912. He was a big stockholder in the plaintiff company. After his death witness negotiated with his widow for the half interest in the patent.

"I was asked to see if she would take a certain amount for her interest in that patent. I was asked by Mr. G. W. Coker to see if I could buy that interest from her for a certain amount. She consented to take the amount. I told Mr. Coker that he could buy it for that amount. I would not be surprised if I didn't witness it [the assignment]. I don't remember the exact date. I bought some stock after Mr. Smith's death from one of his daughters. Mrs. Smith was paid $5,000 for her half interest in the patent. I bought 28 and later some more shares. I decided to leave and went away. After I notified them I expected to leave, I sold this stock to Mr. Dunlop—about 1919. I hired some of the men employed by the Southern Novelty Company; they understood how to make these cones. Hired Bateman in 1919. We had a machine but were not, at that time, putting them on the market; were getting ready to do so."

The testimony tends to show, and without serious contradiction does show, that the plaintiff company was, for several years prior to 1905,

as early certainly as 1903, engaged in manufacturing cones and tubes used by cotton mills; that Walter F. Smith was in the employment of the company, and that W. H. McCall was also in its employment, looking after the manufacture of cones, and "really what you might call superintendent." McCall says they were winding most of the cones by hand, with girls, on a machine—rolling them up on a spindle. They started that machine at that time; made during the month of June, 1903. 311,500 cones. They were removed from the machine and cut as a separate operation. They continued that method until 1905; made some changes before 1905. This method was unsatisfactory. Walter F. Smith was endeavoring by experiment to perfect a blank, by which the cone could be cut to the desired length by a knife attached to the machine, by one operation. This appeared to be the problem to be solved, and Smith was working on it.

L. B. Stogen worked for plaintiff from 1898 as master mechanic; is now in its employment. He helped build all of the machines used by plaintiff. He says that he worked under the instruction of Smith.

"He generally made a pencil drawing of part of it, and then part of it he would just kind of tell me, and I would work that out; some of it he left with me to work out the best I could. The cutting-off devices were first put on the machines in 1905. It was quite a while before we got them to running smoothly. We did a lot of changing before we got them where they would run, so that you could count on them. We had several changes to make. It was a year probably before they were operating satisfactorily. Had different troubles; some with long and short patterns, that would slip and either drop down low on the spindle or mandrel, or pull high and bother the cutting off."

Witness illustrated the difficulties encountered in operating, etc. They corrected this condition in the manner described by the witness "pretty late in 1906, which was about the last we made that amounted to anything." Witness had charge of this work. It was done upstairs —second or third floor of Novelty Company's place. The public generally were not admitted to see what was going on; the company did not allow strangers to come in there. Some of the sectors may have been used in 1905; none as early as 1904. "We never had but two methods of making cones."

R. E. Edwards, a witness for plaintiff, worked for the company in 1903 and 1906; the last year was "cone machine fixer. The machines were then giving right smart trouble in different ways; some would cut long and some short; sometimes soft paper would cause that, and some tongues go in deeper and make the cones fit better. This was with the automatic machines."

H. L. Langston worked for plaintiff 19 or 20 years. Was cone machine fixer after Edwards went to Richmond, in 1906—was gone 30 days. They were making the change at that time—from the old nonautomatic machine to the automatic cut-off. They were having a great deal of trouble with the machines at that time—two or three different troubles—which witness describes. He also describes the changes made, "after which the machines worked better."

S. W. Tedder worked for plaintiff in 1906; went there about cotton planting time. His first work was to put in a running cone machine.

294 F.—46

Langston taught him; tried to run two; "had a good deal of trouble. They were called automatic cut-off machines." Witness describes the difficulties:

"Trouble was in the roller, that if this strip of paper threw in the shares, when they would start so fast it wouldn't quite cut the paper through, and maybe in time it would swing it so that it would push it up too far, and push it past the little slot, that you all have been talking about, in the tongue of the paper. * * * When I went there in 1906, they were still cutting off cones by hand. I could hear them, and saw them doing so."

R. L. Bateman, working for defendant since the 20th of May, 1922, worked for plaintiff summer of 1905.

"I went to run cone machines. They were then using machine-cut cones, with the sectors like those exhibited on trial and cutting the cones off automatically, taught by Langston; worked for plaintiff about two months; left there, and after about a year went back to work for plaintiff, fall of 1906, as cone machine fixer, they were using same machine as in 1905; stayed there until 1921."

J. H. Chapman, witness for defendant, worked for plaintiff about two months in 1905, prior to August, 1905, in cone machine. They were then using automatic cutting machines. Have never been in mill since 1905. This witness' recollection was indefinite.

L. A. King works for defendant; worked for plaintiff from 1903 until 1921; went from plaintiff to defendant. "We disagreed a little, and I decided I would make a change." Before witness went to plaintiff, they were making cones by hand; they changed. "They were using these blanks in 1905"—using the knives—turning off about 12,-000 a day on one machine. Witness was on repair work in plaintiff's factory; worked under Stogen, who was master mechanic. "In 1905 spent most of my time in shop; Saw machines at work in 1905."

The foregoing is the substance of the testimony of the witnesses who worked on the machines.

C. W. Coker, president of the Southern Novelty Company, succeeding his father, Maj. Coker, says that he is familiar with the patent in controversy, and knew Walter F. Smith, who in 1907 was secretary of plaintiff company. He died in 1912; had been connected with the Company since 1899; man of very fine character—splendid character. The patent was issued to Mr. Smith and plaintiff company. Plaintiff, upon the death of Smith, acquired the other half of purchase from his widow, McCall negotiating the sale; paid her $5,000. Witness was director of company in 1905—early part of year. The machine itself was invented by Smith. It was not patented, because he did not want to give away the idea. This was before this patented pattern (or blank) came out. The first was a very crude machine, where the cones were wound by hand, and the next step in the process was the machine that rolled the cone automatically and pushed it off the spindle, but didn't cut the ends; but the third step was automatic cut-off. They are manufactured on the third floor of the building; have been manufactured there ever since we moved into the building that we now occupy, or ever since this automatic cut-off was attached to the machines. It is strictly against the rules of the company to allow any visitors without special permission; have never sold this blank or pattern.

Witness describes the blank and the manner in which it is put upon the mandrel, and, after being made into a cone, the ends cut off automatically by knives so adjusted as to make the cones of uniform length and the cone complete and cut, expelled from the mandrel. He describes the several efforts of Mr. Smith to correct the troubles encountered in the use of the knives, etc. He says:

"There was a considerable period of experiments, but I don't remember just what went on at that time. I do know, however, that cones were sold in the early part of 1906, from these machines, but how many were bad, and what the loss was in the mill on the bad cones, or what the imperfect cones were, I can't testify."

Witness produces a letter from plaintiff, written by Smith to H. I. Koeger, dated November 24, 1905, ordering knives such as are used on the machines. December 20, 1905, a bill for 24 knives. He says that McCall, King, Bateman, and Chapman are men of good character.

The evidence, of which the foregoing is a summary, convinces me that for some time prior to 1905 Walter F. Smith was endeavoring to invent or make a blank, so cut that, when placed on the mandrel, the knives adjusted to cutting off the ends did not affect or injure the cone. Plaintiff had been making and selling cones, by the old method, requiring two operations—one making the cone on the machine, and the other by hand, cutting them to the desired and uniform length. An examination of the cone, introduced and filed as an exhibit, clearly discloses the difficulty encountered by the old method and the manner in which it was remedied by the invention. When explained, it is very simple, but evidently required experimentation to perfect it and bring about satisfactory results. While this testing or experimentation was being done, evidently beginning at some time, not very accurately fixed by any witness, during the year 1905, cones made by both methods were being manufactured and sold by plaintiff company in quite large quantities. The purpose of the invention was not, primarily, to increase the output, but to avoid two operations; that is, making the cone on the machine, cutting the ends to a uniform length by hand. Conceding that some cones, by the new or automatic method of cutting, were made and sold during the year 1905, it is equally clear from the testimony that Smith had not, at that time, perfected his invention. That the operators were having trouble in securing satisfactory results is testified by all of plaintiff's, and not denied by defendant's, witnesses.

Without attributing any other cause for such discrepancy as is found between the testimony of the witnesses than may be expected, when men are testifying from recollection, 17 years after the event, with a desire, more or less controlling, according to the effect of their testimony, upon their interest in the result of the litigation, I am impressed with the conviction that some cones were manufactured by the use of the blanks and automatically cut off and sold. During the years 1905 and 1906 Mr. Smith was testing or experimenting with the blanks, the knives, etc. Trouble, incident to adopting the new method and discarding the old, was experienced, and remedies applied to meet such difficulties, bringing the situation clearly within the principles

announced and the language used by Mr. Justice Matthews in Smith & Griggs v. Sprague, supra. In Elizabeth v. Pavement Co., 97 U. S. 126, 134 (24 L. Ed. 1000), Mr. Justice Bradley says:

"When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such a use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it, and improve it, or not. His experiments will reveal the fact whether any, and what alterations may be necessary. * * * So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent. * * * If used under the surveillance of the inventor, and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvements as experience demonstrates to be necessary, it will still be a mere experimental use, and not a public use, within the meaning of the statute. Whilst the supposed machine is in such experimental use, the public may be incidentally deriving a benefit from it. * * * But if the inventor allows his machine to be used by other persons generally, either with or without compensation, or if it is, with his consent, put on sale for such use, then it will be in public use and on public sale, within the meaning of the law."

The fact must be kept in mind that the invention patented by Smith, the blank so shaped with notches, or tongues, or jogs, as are shown on the exhibit attached to the patent, was of no peculiar value, except as it could be adjusted to the machine, the mandrel, with the knives, etc., by which it could be made into a perfect cone, by a single operation. It was not contemplated that the blank was to be put on the market for sale; none were ever sold. An examination of the exhibit filed shows that, as patented, it was the final result of invention and of experimentation.

[3] If, however, the question of fact is left in doubt by the evidence, the fact that Smith, conceded to have been a man of high character, thoroughly acquainted with the purpose which he had in bringing into existence a blank, which could be used in the manufacture of cones, obviating the difficulties being encountered, after long thought, experience, and experiments, made application for the patent and filed his affidavit as required by the statute, that his invention had not been in public use or sale in the United States for two years prior thereto; that he lived five years after the patent was granted, and that during this time McCall, who was in close association with him, both before and after the patent was issued, made no suggestion nor took any action indicating that he thought that Smith had sworn falsely, but, on the contrary, advised his widow to sell her interest in the patent to plaintiff for $5,000, and bought shares in the company; that he remained in the employment of the plaintiff company until 1919, and it was not until 1921 that he conceived the purpose to attack the validity of the patent upon the theory that Smith had sworn to a falsehood in securing the patent. While these facts are not an estoppel upon him, certainly they impose upon him the duty, in his effort to invalidate the patent on this ground, to establish his allegation by testimony clear, cogent, and convincing. This he has failed to do. If the evidence be fairly balanced, upon elementary principles of fairness and justice, the court must sustain the patent.

[4] I am of the opinion that the decided weight of the evidence shows that Smith told the truth in his affidavit; that the invention was not perfected on December 19, 1905, nor for some months thereafter; and that the application was filed within the time prescribed by the statute. A decree will be signed, enjoining the defendant company from infringing the patent with a reference to ascertain what damage plaintiff has sustained by the infringement to this time. The plaintiff will recover its cost.